## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| MARTIN J. WALSH,<br>SECRETARY OF LABOR,<br>UNITED STATES<br>DEPARTMENT OF LABOR,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>SOFIA & GICELLE, INC., *d/b/a Fast<br>Eddie's, Sports & Billiards, a corporation,*<br>and<br>MARIA AGUILAR, *individually, and as<br>President and owner of the aforementioned<br>corporation,*<br><br>　　　　　Defendants. | Civil Action No. TDC-19-0934 |

## MEMORANDUM OPINION

The United States Secretary of Labor ("DOL") filed this action to enjoin Defendants Sofia

& Gicelle, Inc. d/b/a Fast Eddie's, Sports & Billiards ("Fast Eddie's") and Maria Aguilar, the

president and owner of Fast Eddie's, from violating the recordkeeping, minimum wage, and

overtime pay provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (2018),

and for back wages and liquidated damages due to Defendants' employees under the FLSA. After

granting summary judgment to DOL on Defendants' recordkeeping violations and certain

minimum wage and overtime claims, and otherwise denying summary judgment, the Court then

conducted a three-day bench trial to determine liability and damages on all remaining issues.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court now provides its findings of fact and

conclusions of law.  For the reasons set forth below, the Court finds Defendants liable for the

majority of the remaining minimum wage and overtime claims, but that Defendants are not liable for claims relating to one employee who is exempt from the FLSA requirements as an executive and two individuals who were not proven to be employees. Accordingly, the Court will enter judgment for DOL and award damages as detailed in the accompanying Order.

## FINDINGS OF FACT

Relevant background relating to this case is set forth in the Court's memorandum opinion on the Motion for Summary Judgment. *Scalia v. Sofia & Gicelle, Inc.*, No. TDC-19-0934, 2020 WL 7828770 (D. Md. Dec. 30, 2020).

At trial on July 7, 8, and 9, 2021, the following witnesses testified:  13 current or former bartenders and servers ("service staff"), consisting of Mary Jane Parker, Glenda Lopez, Brook Miles, Destinee Kent, Janay McPherson, Christina Faulks, Kennedi Collins, Hannah Klove, Chrishauna Brooks, Mellissa Albrecht, Jose Hernandez, Jose Alvarez, and Enrique Ferman; three current or former cooks and dishwashers ("kitchen staff"), consisting of Joseph Yearwood, Jimmy Simmons, and Roberto Reyes; two employees of AM Accounting, the firm retained by Fast Eddie's to provide payroll services, consisting of Martha Moscoso and Adrianna Leon; Claudia Villarreal Cuevas, the DOL Wage and Hour Investigator who led the investigation into Defendants' FLSA violations; and Defendant Maria Aguilar.[1]  Based on the witness testimony, as well as the exhibits and stipulations presented at trial, the Court finds the following facts.

## I.   Employer Coverage

Since October 22, 2015, Maria Aguilar has been the sole owner and president of Sofia & Gicelle, Inc., d/b/a/ Fast Eddie's, Sports and Billiards ("Fast Eddie's"), a Maryland corporation

---

[1] The spelling of first and last names for these 53 individuals as included throughout this Memorandum Opinion are based on, in priority order: (1) the spellings as articulated by witnesses during their testimony at trial; (2) the spellings contained in declarations or interview statements signed by the employee; and (3) the spellings provided by DOL in Trial Exhibit 12.

with a restaurant in Suitland, Maryland. Fast Eddie's, a full-service restaurant, night club, bar, and pool hall, is an enterprise engaged in interstate commerce and has had employees who handle and sell goods and materials moving in interstate commerce, such as cooking ingredients, alcoholic beverages, and cleaning supplies from outside of Maryland. Fast Eddie's has had annual gross sales totaling more than $500,000 at all times relevant in this case. Aguilar, as the manager of the day-to-day operations of Fast Eddie's, has acted directly or indirectly in the interest of an employer, specifically, Fast Eddie's.

As relevant to this case and as stated in the memorandum opinion on the Motion for Summary Judgment, the parties entered into an agreement on October 6, 2017 that tolled the statute of limitations ("the Tolling Agreement") from that date forward.

## II.     Employee Coverage

DOL has asserted claims for unpaid minimum wages and overtime pay on behalf of 53 individuals alleged to be current or former Fast Eddie's employees, as listed in DOL's back wage calculations. *See* Trial Exhibit ("Ex.") 12. Defendants have maintained that three of the listed individuals, Roberto Reyes, Tina Doe, and Nancy Doe, are not subject to the FLSA pay requirements either because they are exempt under the FLSA or were not in fact employees of Fast Eddie's.

### A.     Roberto Reyes

Reyes is the husband of Maria Aguilar and works in the kitchen at Fast Eddie's as a salaried employee earning $1,500 every two-week pay period. Reyes generally works four to five days per week from 11:00 a.m. to 12:00 midnight and averages between 50 to 60 hours of work each week. Among Reyes's duties are managing the hiring and termination process for kitchen staff, including by recommending individuals to Aguilar for hire, making work schedules for kitchen staff,

3

ordering food for the kitchen, monitoring cooks' work to ensure it is done properly, and preparing and cooking food.  As stated by Aguilar during her testimony, Reyes hired at least one specific kitchen staff member, Tracy Morgan, and in an interview during the DOL investigation, the report of which was admitted into evidence, James Hudson, a server who began work at Fast Eddie's in December 2015, stated that he was hired by Reyes, who he believed to be one of the owners.

In the kitchen, Reyes supervises two cooks who work at different times during the daytime and nighttime shifts, as well as one dishwasher who works full-time at Fast Eddie's.  As a general matter, Reyes ensures that everything in the kitchen is under control throughout the day and across various kitchen-related tasks.

### B.    Tina Doe and Nancy Doe

The only witness who testified about "Tina Doe" and "Nancy Doe," as identified in DOL's list of employees owed back wages, was Aguilar, who testified that those individuals were employed by an outside contractor retained by customers hosting events at Fast Eddie's to help with service and decorations.  Although "Tina" and "Nancy" appear on a single, undated Fast Eddie's work schedule from July 2016, Ex. 8, Aguilar testified that they were sometimes listed on schedules to note for other employees that they would be working with these contractors on the identified days.  Although a declaration submitted by Parker identified Tina and Nancy as servers, no trial witnesses disputed Aguilar's testimony about the status of these two individuals.

## III.   Pay Practices

### A.    Service Staff

Fast Eddie's service staff, consisting of bartenders and servers, were typically compensated with an hourly wage paid through a paycheck and with tips received from customers.

4

### 1.    Hourly Wage

Based on the testimony of multiple service staff members, including servers Miles, McPherson, and Faulks, and bartenders Lopez, Hernandez, and Ferman, service staff members generally received an hourly pay rate of $3.63 per hour, which is the applicable local minimum wage rate for tipped employees. However, several employees did not receive such an hourly wage for some or all of their work. For instance, certain service staff, including Parker and Kent, were required to stay at Fast Eddie's after their shifts ended and they had clocked out in order to clean the restaurant and to wait for their turn to receive tips received from customer credit card payments, but were not paid for that additional time. Some employees, such as Parker, did not receive any hourly wage when they were going through training. Likewise, as reflected in his interview statement, Hudson did not receive any wages or tips during his first week on the job. Other employees, including Lopez, Miles, and Faulks, received paychecks that did not fully reflect all of the hours they worked. At certain times, service staff such as Lopez received an hourly wage for only 20 hours per week, even though she worked more than 40 hours per week.

Other service staff, such as Collins, Brooks, and Klove, never received a paycheck from Fast Eddie's and were instead compensated only through tips from customers. Relatedly, in the year before she stopped working at Fast Eddie's, Lopez was asked to not cash the checks she received, so her compensation for that period of time was limited to the tips she received as a bartender.

From this evidence, the Court finds that while many service staff received an hourly wage of $3.63 at Fast Eddie's, certain employees were not paid an hourly wage for some or all of their hours worked.

## 2.    Tips

As a general matter, service staff received tips from customers to supplement their hourly wages.  Tips paid by customers in cash were typically directly retained by the server.  When a customer paid tips by credit card, that money was tracked through a central system and given to the customer's server in cash at the end of the night, when the server closed out.  The bartenders pooled all of their credit card tips from the night and divided the total equally among the bartenders who worked that night.

Service staff, however, did not keep all of the tips they earned throughout their shifts.  All service staff members, at the end of their shifts, were required to contribute $10 from their tips to pay a cleaning person.  Several employees, including Miles and Kent, testified that the fee increased to $20 per night if an employee did not want to assist with the cleaning that night.  According to Brooks, the fee varied from $10 to $20 depending on how popular or in demand the event at Fast Eddie's had been that evening.  Employees who did not make enough in tips in a given shift to cover the fee still had to pay the fee out of their own pocket.  The fee was collected either by a bartender, a manager, or another individual.  Brooks testified that she had to hand over the cleaning fee to a man standing at the front door "in order to leave or else we would get fired" and "could not come back" the next day.  7/8/21 Tr. at 51-52.  Similarly, Parker testified credibly that Aguilar told her that she had to pay the cleaning fee or she would not be allowed to come to work the next day.

A total of eight different employees, either in trial testimony or in a written statement admitted into evidence, have stated that this fee was "required," "mandatory," or otherwise compelled.  *See* 7/7/21 Tr. at 24, 97-98, 106, 128; 7/8/21 Tr. at 52; Ex. 6 at 15, 19.  Most notably, Lopez, who was a head bartender at Fast Eddie's and was responsible for training new servers,

informed new employees that they had to clean during and after their shift and that they had "an obligation" to "give $10 for the cleaning staff." 7/7/21 Tr. at 64-65. Lopez testified that this requirement was communicated from both Aguilar and her husband, Reyes, as early as 2015, when the Fast Eddie's location in Maryland opened for business. The Court credits the testimony that the cleaning fee was required.

Beyond the cleaning fee, as described by Parker, Miles, Kent, Faulks, and Brooks, servers had to use their tips to pay the bills of customers who walked out of Fast Eddie's without paying. For example, Kent testified that she had to pay for "walk-outs" on multiple occasions, including one incident when the bill was approximately $200. *Id.* at 98. Likewise, Hernandez, a bar manager who testified as a defense witness, acknowledged that he has had to pay customer walk-out bills out of his tips, which would sometimes result in "negative tips" for the evening. 7/9/21 Tr. at 90-91; *see also* Ex. 6 at 21. Although not all servers experienced customer walk-outs, the Court finds that there was a general policy that servers had to pay the bills arising from customer walk-outs out of their tips.

Finally, as reflected by the testimony of all current or former Fast Eddie's service staff who testified, despite Defendants' apparent reliance on tips to meet the minimum wage requirements for service staff, neither Fast Eddie's nor Aguilar directly or indirectly informed service staff (1) of the tip credit requirements of the FLSA; (2) that Fast Eddie's used tips to satisfy its minimum wage obligations; (3) that Fast Eddie's was required by the FLSA to pay at least $2.13 per hour for all hours worked; (4) that employees were entitled to keep all tips earned; or (5) of the amount that Fast Eddie's could claim as a tip credit. Aguilar herself admitted during her testimony that she has never provided any notice to Fast Eddie's employees of this information.

7

### B.    Kitchen Staff

With the exception of Reyes, who was paid a salary, Fast Eddie's kitchen staff were paid at an hourly rate and did not receive any tips.

Kitchen staff, however, did not always receive pay for all hours worked and did not receive overtime pay.  For example, during the last eight months of his employment, Yearwood, a cook, consistently worked additional hours after he clocked out, during which he cleaned the establishment for three to six hours.  As a result, Yearwood's average work week was 50 hours, but his paychecks compensated him for only 40 hours per week or less, and Yearwood received no overtime pay, or pay of any kind, for the additional hours.

Simmons, who worked in the kitchen at Fast Eddie's as a dishwasher, worked on average 50 hours per week, with 15 to 20 hours attributed to off-the-clock cleaning work he performed with Yearwood.  Like Yearwood, Simmons received a paycheck only for hours worked on the clock and did not receive overtime pay.  For the hours Simmons spent cleaning, he received an unspecified amount of cash.

Finally, as reflected in an interview statement admitted in evidence, Paul Wolfe, a cook, likewise worked up to 60 hours a week but did not receive overtime pay.

### C.    Knowledge of FLSA Requirements

Aguilar was alerted to problems with the Fast Eddie's payroll and recordkeeping processes on several occasions, but she did not make any significant changes to address these issues.  For instance, as stated by Moscoso and Leon of AM Accounting, who were jointly responsible for preparing payroll checks for Fast Eddie's employees, Aguilar did not provide time sheets or other formal records of employee hours worked to AM Accounting and instead provided information about employees' hours worked by phone or text.  Moscoso and Leon both provided a worksheet

to Aguilar to help her keep track of tips and wages, but Aguilar never used it.  Aguilar never reported the amount of tips received by service staff and told Moscoso that she did not want to report the full amount of tips, only the minimum amount, for tax purposes.  As a result, Moscoso and Leon calculated and listed in the payroll records the minimum amount of tips needed to satisfy minimum wage requirements, without knowing if the employees actually received those amounts.  Although Moscoso "stressed" to Aguilar several times that Fast Eddie's must pay overtime, Aguilar told her that she did not want to do so.  7/7/21 Tr. at 163.

On or about December 28, 2016, Aguilar received an Appointment Letter from Cuevas informing her that DOL had initiated an investigation of Fast Eddie's for FLSA violations and requesting that Fast Eddie's provide payroll and other records showing employees' hours worked, tips, commissions, and cash payments.  During the investigation, Cuevas met with Aguilar on at least two occasions.  During an initial conference early in the investigation, Cuevas gave Aguilar DOL Wage and Hour Division Fact Sheet No. 44, a "handy reference guide" that explained the FLSA and summarized the sections of the law.  7/7/21 Tr. at 230-231.

In a subsequent meeting, Cuevas provided to and reviewed with Aguilar DOL Wage and Hour Division Fact Sheet No. 15 ("Fact Sheet No. 15"), which details the various requirements for an employer to be able to use the tip credit to satisfy the minimum wage requirements of the FLSA.  *See* Ex. 37 at 1-2.  Aguilar asked follow-up questions and requested explanations about the tip credit, and Cuevas reviewed mathematical examples illustrating how it worked.  Among other guidance, Fact Sheet No. 15 specifically states that if an employer claims the tip credit, it "may not take deductions for walk-outs."  *Id.* at 3.  It also states that "[w]here an employer is required to contribute to a tip pool that includes employees who do not customarily and regularly receive tips, the employee is owed the full $7.25 minimum wage."  *Id.*

9

On February 27, 2018, at the conclusion of the investigation, Cuevas provided Aguilar with an oral report on the findings of the investigation. As documented in the Final Conference Report, Cuevas informed Aguilar that she had found minimum wage, overtime, and recordkeeping violations of the FLSA, including that Fast Eddie's had failed to keep accurate records of all hours worked, and she again reviewed with Aguilar Fact Sheet No. 15 and the requirements to use the tip credit.

Nevertheless, as acknowledged by Aguilar, following the investigation, she continued to employ certain individuals without establishing payroll records or providing them with a paycheck, and she still does not maintain records of tip amounts earned by employees or report those figures to AM Accounting.

## CONCLUSIONS OF LAW

DOL seeks judgment against Defendants for back wages and liquidated damages owed pursuant to the FLSA to current and former employees of Fast Eddie's. DOL also seeks an injunction against Defendants barring them from future violations of the recordkeeping, minimum wage, and overtime pay provisions of the FLSA.

## I.     FLSA Coverage

The parties do not dispute that since October 22, 2015, Maria Aguilar has been the sole owner and president of Sofia & Gicelle, Inc., which operates Fast Eddie's, and that Defendants are each a covered "employer" as defined in 29 U.S.C. § 203(d). The parties also agree that from that date forward, Fast Eddie's has been an "enterprise engaged in commerce" with an annual gross volume of sales or business of not less than $500,000. 29 U.S.C. § 203(s)(1). Accordingly, the Court finds that Fast Eddie's employees were covered by the minimum wage and overtime requirements of the FLSA from October 22, 2015 to February 1, 2020, ("the relevant time period"). 29 U.S.C. §§ 206(a), 207(a). Because DOL is seeking damages only for the relevant time period,

10

pursuant to the Tolling Agreement executed on October 6, 2017, the entire relevant time period falls within the FLSA's statute of limitations. 29 U.S.C. § 255(a).

## II.    Covered Employees

Defendants argue that among the list of 53 individuals for whom DOL is seeking back pay, one employee, Roberto Reyes, is exempt from the pay requirements of the FLSA because he worked in an "executive" capacity, 29 U.S.C. § 213(a)(1), and two individuals, Tina Doe and Nancy Doe, were never employees of Fast Eddie's and therefore are also not subject to the pay requirements of the FLSA.

### A.    Roberto Reyes

Reyes, who is Aguilar's husband, worked at Fast Eddie's in the kitchen and received a salary. Defendants acknowledge that although he worked more than 40 hours per week, he did not receive overtime pay. FLSA wage requirements do "not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). In order to qualify as an "employee employed in a bona fide executive capacity," an employee must: (1) have been compensated on a salary basis at a rate of not less than $684 per week; (2) have had, as a primary duty, the "management of the enterprise in which the employee is employed" or of a "customarily recognized department or subdivision thereof"; (3) have "customarily and regularly directed the work of two or more employees"; and (4) have had "the authority to hire or fire other employees" or be an employee whose "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100 (2020). "An employer bears the burden of proving that a particular employee's job falls within [this] exemption." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 757 (4th Cir. 2011) (quoting *Darveau v. Detecon,*

*Inc.*, 515 F.3d 334, 337 (4th Cir. 2008)). Courts must look beyond the employee's job title and consider the employee's salary and duties to determine whether the exemption applies. 29 C.F.R. § 541.2.

Reyes regularly received a salary of $1,500 every two weeks, or $750 every week, which exceeds the compensation requirement for an exempt executive employee. Based on Reyes's uncontroverted testimony, the Court finds that one of Reyes's primary duties was to manage both operations and personnel within the Fast Eddie's kitchen, which is a recognized subdivision of the company. Although Reyes also engages in food preparation and cooking, he testified that when he is at work, he also has an overarching responsibility to ensure that everything in the kitchen is under control, including ordering inventory, making the work schedule for kitchen staff, and checking the work of the cooks. Moreover, as testified to by Lopez, who had managerial duties relating to the bar, Reyes was one of the main points of contact within Fast Eddie's for administrative issues, such as discussing the end-of-shift cleaning fee or addressing complaints about paychecks. Thus, the Court finds that Reyes had as a primary duty the management of the kitchen at Fast Eddie's.

The Court also finds that Reyes has "customarily and regularly directed the work of two or more employees." 29 C.F.R. § 541.100. Reyes testified that on a regular day, he supervises two cooks who each cover either the daytime or nighttime shift, as well as a full-time dishwasher. Where trial testimony from cooks and dishwashers established that individuals in both roles have worked an average of 50 hours a week per employee, the Court finds that Reyes meets the supervision requirement of the executive exemption. *See In re Family Dollar FLSA Litig.*, 637 F.3d 508, 513-14 (4th Cir. 2011) (holding that an employee "customarily and regularly" directs the work of two or more employees as required for the executive exemption if, in aggregate, the

"subordinates work 80 hours or more per week," and the supervision is "greater than occasional" but "may be less than constant").

Finally, Reyes testified that he participates in the hiring and termination process for kitchen staff, including recommending to Aguilar that certain applicants be hired. This testimony is corroborated by that of Aguilar, who stated that Reyes hired Morgan, and by the interview statement of Hudson, who stated that he was hired by Reyes. Particularly in light of his status as Aguilar's husband, the Court finds that Reyes had the authority to make personnel decisions about kitchen staff and, at a minimum, his "suggestions and recommendations" relating to hiring were given "particular weight." 29 C.F.R. § 541.100(a)(4).

While Defendants have met their burden of showing that Reyes meets all four requirements of the executive exemption, DOL offered no contrary evidence other than a 2016 interview statement by Reyes in which he described his cooking duties but did not reference any managerial duties. The statement, however, does not directly contradict Reyes's trial testimony, as it does not state that he had no managerial functions, and neither the DOL investigator nor the statement itself identifies whether Reyes was asked to discuss any managerial role in the statement. DOL notably presented no witnesses who contradicted Reyes claim that he had managerial duties. Under these circumstances, the Court finds that Reyes satisfied the requirements for the executive exemption, such that the FLSA minimum wage and overtime provisions do not apply him. Accordingly, the Court will not award back wages as to Reyes.

**B.      Tina Doe and Nancy Doe**

As for the question of whether Tina Doe and Nancy Doe were employees of Fast Eddie's, DOL, as the party "seeking compensation under the [FLSA]," bears the "initial burden of proving that an employer-employee relationship exists" for enforcement of the FLSA. *Benshoff v. City of*

*Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999). The Court finds that DOL has not satisfied that burden. DOL bases the claim that Tina Doe and Nancy Doe were employees of Fast Eddie's on two pieces of evidence: a declaration by Parker stating that Tina Doe was a server who worked one day a week and during special events and that Nancy Doe was a server who worked during special events approximately three days a week, and a single schedule covering a seven-day period in 2016 listing "Tina" and "Nancy" as servers with shifts on two and three days that week, respectively. *See* Ex. 8. Aguilar, however, testified that these two individuals were contractors employed by another company to work during special events for which customers rented space at the restaurant, and that their names were included on the schedule to provide notice to other employees of their presence on the premises. This account is not inconsistent with the other evidence, as the one-week schedule did not establish any consistent or long-term role for Tina and Nancy at Fast Eddie's, and Parker's reference to Tina and Nancy as servers does not necessarily mean that she correctly understood their employment relationship. Notably, DOL provided no evidence to refute Aguilar's account and tellingly did not even seek to elicit testimony from Parker, who was a DOL witness at trial, about Tina and Nancy. Though DOL interviewed and presented the testimony of numerous current and former employees as witnesses, the fact that DOL was never able to identify their last names, and none of their witnesses expressed any knowledge about them, illustrates the weakness of DOL's evidence.

Under these circumstances, the Court finds based on the preponderance of the evidence that DOL has failed to meet its burden to prove that Tina Doe and Nancy Doe were employees of Fast Eddie's. Accordingly, the Court will not award back wages as to these two individuals.

### III.   Minimum Wages

DOL is seeking back wages on minimum wage violations for both service staff and kitchen staff. The FLSA requires an employer to pay each employee a minimum wage for each hour worked. 29 U.S.C. § 206(a). At all relevant times, the federal minimum wage rate was $7.25 per hour. 29 U.S.C. § 206(a)(1)(C).

#### A.   Service Staff

For tipped employees such as Fast Eddie's kitchen staff, an employer may satisfy the federal minimum wage requirement by paying a lower minimum wage rate and adding the amount of tips earned by the employee to total the requisite $7.25 per hour. *See* 29 U.S.C. § 203(m)(2). To be eligible for this "tip credit" under the FLSA an employer must:  (1) pay tipped employees at least $2.13 per hour as a base wage; (2) inform the relevant employees of the tip credit provision and that the employer is claiming the tip credit; and (3) allow the employees to retain all tips that they received. 29 C.F.R. § 531.50(a)-(c); *see Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 680–81 (D. Md. 2012). These latter two requirements are "strictly construed" and "must be satisfied even if the employee received tips at least equivalent to the minimum wage." *Dorsey*, 888 F. Supp. 2d at 681 (citation omitted). Maryland law provides for a higher minimum base wage for tipped employees of no less than $3.63 per hour. Md. Code Ann., Lab. & Empl. § 3-419(c) (LexisNexis 2016).

Here, the main dispute underlying the minimum wage claims for service staff is whether servers and bartenders were allowed to retain all of the tips they received. DOL presented evidence of two independent ways in which Fast Eddie's failed this requirement. The first was that at the end of every shift, service staff were required to pay out of their tips a regular cleaning fee, usually $10 but up to $20.

Aguilar has acknowledged that she was aware of this practice, but she and other defense witnesses, including Hernandez and Albrecht, claimed that it was a voluntary practice among the service staff to pay a cleaning fee to go to designated personnel who thoroughly cleaned the restaurant after closing so that the other employees would not have to clean as much each evening and could go home earlier. Hernandez testified that this arrangement dated back to when he first started working at the Virginia location of Fast Eddie's in 2009 and was continued after the restaurant moved to its Maryland location.

Where eight different Fast Eddie's employees have testified or asserted in written statements that the cleaning fee was mandatory, the Court finds that the payment was, in fact, required. In particular, Lopez, a bar manager, testified credibly that the requirement to pay the cleaning fee came from Aguilar and Reyes, not other employees, and that she told new employees that it was an "obligation." 7/7/21 Tr. at 64-65. Brooks testified credibly that an individual stood at the door to collect the fee, and she and Parker testified credibly that if a server failed to pay, that individual would be terminated. Aguilar specifically told Parker that she had to pay the fee or she would not be allowed to come to work the next day.

Thus, even assuming that the cleaning fee was initially started as a result of a voluntary agreement among employees many years ago, the evidence establishes that during the relevant time period, it was a requirement at Fast Eddie's, particularly where rank-and-file employees overwhelmingly understood it to be mandatory, and where Aguilar was fully aware of the practice and has never tried to stop it, which is not surprising because it effectively and inappropriately passes a necessary cost of the business onto the employees. Significantly, neither Aguilar nor any other Fast Eddie's employee identified any specific employee who elected not to pay the cleaning fee and instead stayed later to participate in the overall cleaning of the restaurant. Thus, the Court

16

concludes that the cleaning fee was a mandatory requirement, effectively approved and enforced by management, and constitutes one way in which the service staff were not allowed to keep all of their tips.

In addition to the required cleaning fee, the evidence, including the testimony of six different Fast Eddie's servers, established that servers were required to reimburse Fast Eddie's out of their tips for the charges incurred by customers who walked out without paying. Though Aguilar denied the existence of this policy and claimed that Fast Eddie's has experienced no more than three walk-outs in its history, this testimony was contradicted by the multiple service staff who testified about walk-outs, including Kent, who identified three walk-outs that she personally experienced, and Albrecht, a defense witness, who, while denying that employees had to pay for walk-outs, testified that employees were counseled when they experienced walk-outs four or five times. Most significantly, Aguilar's testimony is contradicted by that of Hernandez, a defense witness, who testified that he personally had to pay for customer walk-outs out of his own tips, sometimes resulting in "negative tips." 7/9/21 Tr. at 90-91; *see also* Ex. 6 at 21.

Therefore, where service staff were required to cover cleaning fees and customer walk-outs through their tips, the Court finds that these tipped employees were not allowed to retain all of the money they earned from tips. As a result, Fast Eddie's is not permitted to claim the benefit of the tip credit to satisfy its minimum wage obligations. *See* 29 U.S.C. § 203(m)(2); 29 C.F.R. § 531.50(a)-(c).

Furthermore, the tip credit is also unavailable to Fast Eddie's because it is undisputed that neither Aguilar nor any other manager at Fast Eddie's ever informed the service staff about the tip credit requirements or that Fast Eddie's was claiming the tip credit to satisfy minimum wage requirements, as required for an employer to use the tip credit. *See* 29 C.F.R. § 531.50(b). Finally,

where several service staff, including Collins, Brooks, Klove, and Lopez, testified that at various times they received no hourly wages and instead were paid only through tips, Fast Eddie's did not even meet the additional tip credit requirement that they pay their tipped employees at least $2.13 per hour as a base wage. *See* 29 U.S.C. § 203(m)(2)(A). Where Defendants do not claim that they ever paid service staff $7.25 per hour and were not permitted to apply the tip credit, the Court finds that they violated the FLSA minimum wage requirements as to the service staff.

**B.    Kitchen Staff**

DOL has asserted that Fast Eddie's failed to pay the minimum wage to certain kitchen staff employees. DOL's primary argument on this issue is that although most kitchen staff were paid an hourly wage that exceeded $7.25 per hour, they did not receive pay for all hours worked, and that when their total wages were considered in light of their actual hours worked, the effective rate was below $7.25 per hour. In other instances, the minimum wage violation arose from the fact that the kitchen staff member received no hourly paycheck at all.

Where the Court had deemed Reyes exempt from the FLSA pay requirements, *see supra* part II.A, there are 11 kitchen staff employees who remain the subject of this claim, including Aranniva Eliezer Asael, Carlos Barksdale, Kenia Garcia Marin ("Garcia"), Jose Jose, Anthony Morales, Tracy Morgan, Alberto Rufino, Trenida Scott, Simmons, Paul Wolfe, and Yearwood. Of these 11 kitchen staff, the Court heard trial testimony from Yearwood, a cook, and Simmons, a dishwasher. The Court also received in evidence interview statements or declarations from Garcia, Simmons, Scott, Wolfe, and Yearwood.

For Garcia, she received no paycheck, so there is no record that she received the minimum wage. Though Aguilar testified that Garcia was paid in cash, in the absence of any pay records relating to Garcia and in light of the multiple other minimum wage violations relating to kitchen

18

staff, as discussed below, the Court finds this testimony insufficient to establish that she was paid the minimum wage for all hours worked.

As for the other four employees who testified at trial or provided interview statements detailing their individual work schedules, Cuevas drew upon this information, along with timesheets and payroll records, to determine that the effective hourly rate based on the size of their paycheck for a pay period was almost always below the federal minimum wage. For instance, for Yearwood and Simmons, available payroll records show that both employees were usually compensated for less than 40 hours per week (80 hours per two-week pay period) and sometimes for as few as 20 hours per week, and that for that work they were paid at rates ranging from around $9.55 to $10.50 an hour each pay period. At trial, however, both employees testified that they worked on average 50 or more hours per week, so their effective hourly rate was actually less than $7.25 per hour. Similarly, payroll records for Wolfe and Scott credit them for working approximately 30 hours per week at hourly rates ranging from $8.40 to $11.00, but both employees' interview statements assert that their work weeks frequently exceeded 40 hours, resulting in an effective hourly rate that was at times below $7.25. The Court credits Cuevas's analysis and calculations as to these four employees, which are not seriously contested by Defendants, and concludes that all received less than the federal minimum wage during their terms of employment at Fast Eddie's.

As for the remaining six kitchen staff, consisting of Asael, Barksdale, Jose, Morales, Morgan, and Rufino, while there is no direct evidence from these individuals about the hours they worked, the Court credits Cuevas's calculations showing that based on available timesheets and payroll records reflecting the number of hours for which they were paid, there were minimum wage violations based on the amounts received by these employees as compared to their average

19

weekly hours. Thus, the Court finds liability for minimum wage violations for the 11 identified kitchen staff and will grant them back pay.

## IV.    Overtime Pay

Under the FLSA, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of [forty hours] specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). An employee's "regular rate" is the hourly rate that the employer pays the employee for a normal, 40-hour workweek, but that "fixed amount must be sufficient to provide compensation at a regular rate not less than the minimum hourly rate." *Flood v. New Hanover Cnty.*, 125 F.3d 249, 252 (4th Cir. 1997). "Where a higher minimum wage than that set in the Fair Labor Standards Act is applicable to an employee by virtue of such other legislation, the regular rate of the employee . . . cannot be lower than such applicable minimum." 29 C.F.R. § 778.5. During the relevant period, the Prince George's County minimum wage requirements exceeded the state Maryland minimum wage requirements, and as relevant to the employees with overtime claims, the regular rate based on the local minimum wage was $9.55 per hour for the 12-month period as of October 1, 2015, $10.75 per hour for the 12-month period as of October 1, 2016, and $11.50 per hour for the 12-month period as of October 1, 2017. *See* Md. Code Ann., Lab. & Empl. § 3-413(c)(1); Prince George's Cnty. Mun. Code div. 2 § 13A-117 (2021).

### A.    Service Staff

The Court previously granted summary judgment to DOL on the overtime claims relating to Camari Berri, Ferman, Hudson, D'Ann Johnson, and Parker. Before trial, the parties reported that they had resolved those claims as to damages, and the Court will award the agreed-upon

amounts. Based on DOL's back wage calculations submitted at trial, the remaining service staff with overtime claims are Miles and Lopez.

The Court credits Cuevas's calculations that both employees worked overtime and were not compensated at one and one-half times the regular rate, as required by the FLSA. As to Miles, payroll records show that in the last week of 2016, Miles worked 42 hours, but her paycheck reflected a payment of only $3.63 for those two additional hours worked. As to Lopez, she testified that she regularly worked over 50 hours a week on average, and Cuevas's calculations based on the payroll records show that Lopez did not make an hourly wage anywhere close to $7.25 per hour for her overtime hours, much less the appropriate one and one-half times that rate. Thus, the Court finds Defendants liable for the remaining service staff overtime claims and will award back wages for those undercompensated overtime hours worked.

### B.    Kitchen Staff

The kitchen staff overtime claims that were not resolved at summary judgment are the claims for Garcia and the claims for Yearwood and Wolfe for the time period after May 6, 2016. Based on DOL's back wage calculations submitted at trial, DOL is also claiming unpaid overtime for Scott.

As to Garcia, while Cuevas credited her with working 49 hours per week over a three-week period, the only evidence of Garcia's work hours is her own interview statement in which she stated that she worked four days a week, seven hours a day, for a total of 28 hours a week. Where the Court cannot identify the basis of crediting Garcia with working over 40 hours a week, it will not find an overtime pay violation relating to her.

The Court does, however, credit Cuevas's calculations that Yearwood and Wolfe did not receive overtime pay owed to them for the time period after May 6, 2016. Yearwood testified that

he worked on average more than 50 hours a week, and that in particular in the last eight months of his employment leading up to his departure in October 2016, he was regularly cleaning for several hours off the clock beyond a regular 40-hour work week. The payroll records, however, show that through his last week of work, he was never paid for more than 35 hours of work in a week. As for Wolfe, his interview statement provides evidence that he worked more than 40 hours per week but was not paid overtime.

Finally, the Court credits Cuevas's conclusion that Scott worked overtime that was not properly compensated, based on her interview statement that she worked more than 40 hours per week on at least one occasion and Fast Eddie's payroll records showing that Scott was paid for no more than 32 hours a week.

Accordingly, the Court finds overtime pay violations as to Yearwood, Wolfe, and Scott and will award them back wages.

## V.      Liquidated Damages

In a DOL civil enforcement action under the FLSA, DOL may seek, in addition to unpaid minimum wages or overtime pay, "equal amount as liquidated damages," resulting in double damages. 29 U.S.C. § 216(c). However, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed" double damages. 29 U.S.C. § 260. An employer bears "a plain and substantial burden . . . to persuade the court that the failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997). Thus, double damages are "the

22

norm," *id.*, and good faith is an affirmative defense, *Braxton v. Jackson*, 782 F. App'x 240, 245 (4th Cir. 2019) (citing *Mayhew*, 125 F.3d at 220).

"Good faith in this context requires more than ignorance of the prevailing law or uncertainty about its development" but rather "requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them." *Lockwood v. Prince George's Cnty.*, 58 F. Supp. 2d 651, 658 (D. Md. 1999) (quoting *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)). Though an employer "may not simply remain blissfully ignorant of FLSA requirements," it also "need not seek an opinion letter to avoid paying liquidated damages later." *Roy v. Cnty. of Lexington*, 141 F.3d 533, 548–49 (4th Cir. 1998) (quoting *Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984)).

The United States Court of Appeals for the Fourth Circuit has found that evidence that a company sought the advice of lawyers or non-legal consultants with relevant expertise in labor law, paired with subsequent changes to business practices based on this advice, can be sufficient evidence of good faith. For example, in *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350 (4th Cir. 2011), the court affirmed the district court's denial of liquidated damages and finding of good faith where the company had changed its pay practices in reliance on 14 letters and memoranda from an attorney. *Id.* at 376. The court found that even though the letters were not provided as formal legal advice from an attorney retained by the company for that purpose, the employer's reliance on informed outside resources was sufficient evidence of good faith. *Id.* Likewise, in *McFeeley v. Jackson Street Entertainment, LLC*, 825 F.3d 235 (4th Cir. 2016), the court credited an employer's reliance on attorney advice about employee classification under the FLSA as evidence of good faith for a certain time period, as contrasted with prior time periods when the company just assumed it was operating lawfully. *Id.* at 245; *see also Roy*, 141 F.3d at 549 (affirming the

district court's denial of liquidated damages where "the County's consultation with counsel and ongoing modification of its compensation structure to accommodate changes in the Act provides adequate proof that it did not take an 'ostrichlike' approach to the Act, even though the County's interpretation ultimately has been rejected").

Beyond consultation with legal experts, the Fourth Circuit has found sufficient evidence of good faith when the employer sought and relied on other resources providing guidance on FLSA obligations, such as an industry newsletter. *See Burnley v. Short*, 730 F.2d 136, 140 (4th Cir. 1984) (affirming the denial of liquidated damages where the employer relied on, among other things, the Virginia Motel Association's newsletters to keep informed of FLSA coverage). On the other hand, the Fourth Circuit has found that mere assumptions that business conduct is correct are insufficient to demonstrate good faith because "[i]f mere assumption amounted to good faith and reasonable belief of compliance, no employer would have any incentive to educate itself and proactively conform to governing labor law." *McFeeley*, 825 F.3d at 245.

Here, Defendants have failed to meet their burden to show good faith. Although they have argued that Aguilar did not fully understand the tip credit requirements, even if that were true, more is required. Defendants have not presented any evidence that they sought out legal advice on FLSA compliance or tried in other ways to become informed of their FLSA obligations. To the contrary, Aguilar admitted at trial that she received guidance on the minimum wage and overtime requirements from both accounting firms she relied on for payroll services, including Oropeza & Associates prior to 2016 and AM Accounting after 2016, yet she did not follow that advice. Moscoso and Leon of AM Accounting both testified that to facilitate Aguilar's compliance with FLSA requirements, they provided her with forms she could use to provide necessary payroll information, but Aguilar never utilized them. They advised her to provide records showing the

24

actual tips received by Fast Eddie's employees, but she never did so and stated that she wanted to report only the minimum amount of tips required, forcing them to calculate and enter figures for tips without knowing if the tips were actually received. They advised her multiple times that she needed to pay overtime, but she stated that she did not want to do so.

Further, Aguilar received specific information about FLSA obligations in December 2016, when Cuevas notified her of the DOL investigation and provided her with Fact Sheet No. 44 explaining the minimum wage and overtime requirements. Significantly, Cuevas later provided and reviewed with Aguilar Fact Sheet No. 15, which describes the requirements of the tip credit and specifically advises that it is not available if tipped employees do not receive all tips, such as because of having to pay for walk-outs or if some of their tips are diverted to employees who do not receive tips. Then, at the final conference in February 2018, Aguilar was informed that DOL had concluded that there were minimum wage and overtime violations, including as to the tip credit. Although Fast Eddie's apparently started keeping time sheets and improved some payroll practices after the initiation of the investigation, Aguilar never began keeping records of earned tips or reporting actual figures to AM Accounting, never began providing service staff with notice of the FLSA tip requirement provisions, and has never stopped the practices of requiring that a cleaning fee and walk-outs be paid out of tips. Notably, even after the investigation was completed, Aguilar hired or continued to employ certain servers, such as Brooks and Klove, who were not added to the payroll, received no hourly wage, and received only tips, in clear violation of the minimum wage requirement.

Where Defendants must demonstrate that they took some affirmative action to understand and comply with their FLSA obligations, and Aguilar not only failed to do so but continued to engage in FLSA violations even after receiving specific, actual notice of the relevant FLSA

requirements, the Court rejects Defendants' argument that they acted in good faith and will therefore award liquidated damages on the minimum wage and overtime claims, as detailed below. *See infra* part VI.

## VI.   Damages

To establish the amount of damages, DOL has provided a spreadsheet, Exhibit 12, prepared by Cuevas that calculates for each of the 53 employees at issue in this case the unpaid minimum wages and overtime pay across the relevant time periods. As discussed above, the Court finds no liability as to Reyes, Tina Doe, or Nancy Doe. *See supra* part II.  Otherwise, particularly where Defendants have offered no meaningful contrary damages evidence, the Court generally credits Cuevas's calculations as to back wages across the relevant categories, including the addition of liquidated damages equal to the total damages owed to each employee.

The Court, however, makes three broad adjustments to the calculations, as well as a few employee-specific adjustments. First, where Cuevas's calculations of unpaid minimum wage were based on a rate that was higher than the federal minimum wage rate of $7.25 per hour, such as the state or county minimum wage, the Court amended the calculations to be based on the federal figure.   This adjustment was applied to the following employees: Ferman, Garcia, Hudson, Johnson, Parker, and Scott. This adjustment was not applied to adjust the "regular rate" underlying overtime pay calculations, because "[w]here a higher minimum wage than that set in the Fair Labor Standards Act is applicable to an employee by virtue of such other legislation, the regular rate of the employee . . . cannot be lower than such applicable minimum."  29 C.F.R. § 778.5.

Second, the Court will not award damages for minimum wage violations as to Ajailia Hall, Shantee Hydee, and Inna Quarterma because there is insufficient information upon which to render a calculation.  Although employees generally should not be denied recovery on the grounds that

they are "unable to prove the precise extent of uncompensated work," DOL still bears the initial burden of proving that individual employees "in fact performed work for which [they were] improperly compensated," which in turn requires sufficient evidence "to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). As to Hall, Hydee, and Quarterma, the Court finds that DOL has failed to meet this burden. Payroll records show that these three employees, at one point, worked for Fast Eddie's and were each paid a certain total amount of wages by the end of certain 3- to 12-month periods. Apart from these records, however, there is no evidence, either from interview statements, testimony, or other company records, providing any information on how many weeks or hours these employees worked within these time periods. Where Cuevas generally testified that in the absence of such information, she performed her minimum wage calculations by formulating averages that "cross-reference" from other employees' statements or "any other available data provided and retrieved through the investigative period," 7/8/21 Tr. at 33-34, she appears to have assumed that Hall, Hydee, and Quarterma worked every week during the multi-month periods in which they received some payroll wages and thus assumed that all three employees worked 21.45 hours a week every week. For instance, where payroll records show that Hall was paid a total amount of $128.97 during the last quarter of 2016, Cuevas calculated Hall's weekly pay to be $6.98 for three straight months, and based on a work week of 21.45 hours, this led to an effective hourly rate of $0.33 an hour, a highly irregular figure. However, had Hall worked for only a short period of time, or otherwise worked only a low number of total hours, she arguably could have been paid at the minimum wage rate.

As revealed by the witness testimony throughout trial, there is significant variation at Fast Eddie's across all aspects of server employment. Service staff have been employed for as long as

over 20 years and as short as two weeks. There is also no uniform work schedule or shift length, as the restaurant's hours of operations often depended on individual events or external factors like sports seasons. *See, e.g.* 7/7/21 Tr. at 94. Servers also did not necessarily work every consecutive week based on personal circumstances, including other jobs, and sometimes employees were terminated from work, only to be re-employed several months later. Therefore, without more detail relating to Hall, Hydee, or Quarterma, particularly on the number of hours they worked to garner the limited wages they were paid, the Court finds insufficient basis to conclude both that these three servers worked sufficient hours that their effective hourly rates were below the minimum wage and that they worked the hours credited to them by Cuevas.

Third, for other employees who did not testify at trial or did not provide any statements about their employment at Fast Eddie's, the Court adjusted Cuevas's calculations to remove back pay owed for weeks in which Cuevas could not point to any timesheets or payroll records to support the conclusion that the particular employee in fact went to work during those weeks. Although Cuevas apparently inferred that these employees must have worked every week from the start to end of the employment, as discussed above, the generally irregular nature of the work schedules of Fast Eddie's employees makes it inappropriate to draw such a broad conclusion in the absence of additional evidence. Thus, under the specific facts of this case, as to employees for which there is no testimony and there are no interview statements about their individual work schedules, where Cuevas identified timesheets or payroll records for certain time periods reflecting that such records were maintained for an employee, but had no such records for that employee for a substantial period of time spanning weeks or months in between those pay periods, the Court will not apply Cuevas's assumption that those employees actually worked during those intervening

weeks and thus will not award back wages for those weeks. This adjustment was applied to the following employees: Glen Inman, Ever Jose, and Rufino.

As to Albrecht, where she specifically testified that she worked at Fast Eddie's seasonally, as well as on and off whenever there was a need, the Court does not credit Cuevas's assumption that she worked during all weeks for which there are no pay records and has adjusted the damages to exclude amounts associated with those weeks.

Finally, as to Garcia, where her own interview statement reflected that she worked only 28 hours per week, the Court does not credit Cuevas's estimate that she worked 49 hours per week and adjusts downward the amount of damages owed to her for minimum wage violations to account for the lower number of hours.

Applying the adjustments discussed above and the Court's other relevant findings as described above, the Court concludes that the following employees are owed the amounts of back wages set forth in the table contained in the accompanying Order. The table includes damages for the overtime pay claims of Berri, Ferman, Hudson, Johnson, Parker, and Alvarez, for the which the listed amounts are the same figures agreed upon by the parties prior to trial. It also includes damages on claims for which liability was found on summary judgment, but for which the amount to damages was to be resolved at trial, and damages on claims for which both liability and damages were to be resolved at trial.

## VII. Injunctive Relief

As for Plaintiffs' request for injunctive relief, under the FLSA, this Court may grant injunctive relief "to restrain violations" of any withholding of payment of minimum wages or overtime compensation. 29 U.S.C. § 217. "A suit for an injunction brought by the [DOL] . . . is essentially equitable in nature . . . in which the trial court has broad discretion to fashion its decree

according to the circumstances of each case." *Clifton D. Mayhew, Inc. v. Wirtz*, 413 F.2d 658, 663 (4th Cir. 1969). In determining whether to issue a prospective injunction under the FLSA, courts consider the employer's previous conduct, its current compliance or noncompliance, and the dependability of any assurances that it will comply with the FLSA in the future. *See, e.g., Martin v. Funtime, Inc.*, 963 F.2d 110, 114 (6th Cir. 1992); *Donovan v. Brown Equip. & Serv. Tools, Inc.*, 666 F.2d 148, 158 (5th Cir. 1982) (quoting *Dunlop v. Davis*, 524 F.2d 1278 (5th Cir. 1975)); *see also Chao v. Va. Dep't of Transp.*, 157 F. Supp. 2d 681, 690 (E.D. Va. 2011) (citing cases reflecting that five different United States Courts of Appeals apply the same or similar tests), *rev'd in part on other grounds*, 291 F.3d 276 (4th Cir. 2002)). An injunction is warranted only "where the court is convinced that such relief is necessary to prevent future violations." *Walling v. Clinchfield Coal Corp.*, 159 F.2d 395, 399 (4th Cir. 1946) (citations omitted).

Here, based on its ruling on summary judgment that Defendants engaged in FLSA recordkeeping violations as well as certain FLSA minimum wage and overtime violations, as well as its findings based on the evidence at trial that Defendants engaged in even more FLSA violations relating to additional employees, the Court finds that Defendants engaged in significant, wide-ranging violations of the FLSA. *See supra* parts III, IV. Further, even after receiving information about its FLSA violations, Defendants continued to violate the law, including by still trying to invoke the tip credit despite the continuation of policies that preclude it, such as requiring a cleaning fee and payments for walk-outs, and by hiring or continuing to employ certain service staff to work for tips only without receiving an hourly wage. Only in March 2021, three years after the completion of the investigation and during the pendency of this case, did Defendants start to implement limited changes around the tracking of tips. Based on this track record, the Court continues to have concerns about Defendants' present level of compliance and the reliability of

any assurances of future compliance. Accordingly, the Court will grant DOL's request for injunctive relief to ensure Defendants' compliance with the FLSA, as set forth in the accompanying Order.

## CONCLUSION

For the foregoing reasons, based on the evidence presented at trial, the Court finds Defendants liable on the FLSA minimum wage and overtime claims relating to the specific employees identified in parts III and IV, and it will enter judgment in favor of DOL on those claims. Damages and injunctive relief will be awarded as set forth in the accompanying Order.

Date: August 5, 2021

THEODORE D. CHUANG
United States District Judge

31